IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FILED**

APR – 4 2005

U.S. DISTRICT COURT
WHEELING, WV 26003

| | |
|---|---|
| HAWEY A. WELLS, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 3:03-CV-38 |
| | ) (BROADWATER) |
| | ) |
| ANTHONY J. PRINCIPI, SECRETARY, | ) |
| DEPARTMENT OF VETERANS AFFAIRS, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S MOTION TO DISMISS AND
## MOTION FOR JUDGMENT ON THE PLEADINGS

Comes now the Defendant, Anthony J. Principi, Secretary, Department of Veterans Affairs,

by Daniel W. Dickinson, Jr., Assistant United States Attorney for the Northern District of West

Virginia, and respectfully moves the Honorable Court, pursuant to Fed.R.Civ.P. 12(h)(3), to dismiss,

or pursuant to Fed.R.Civ.P. 12(c), for judgment on the pleadings in the above-captioned action for

lack of subject matter jurisdiction, and the Defendant further moves, pursuant to Rule 56,

Fed.R.Civ.P., that summary judgment be granted herein on the grounds that there is no genuine issue

as to material fact and that Defendant is entitled to judgment as a matter of law, and for such other

grounds as are more fully set forth in the accompanying Memorandum in Support of Defendant's

Motion to Dismiss and for Summary Judgment.

Respectfully submitted,

THOMAS E. JOHNSTON
United States Attorney

by: 

Daniel W. Dickinson, Jr.
Assistant United States Attorney
P. O. Box 591
Wheeling, WV 26003
(304) 234-0100

<u>CERTIFICATE OF SERVICE</u>

I, Daniel W. Dickinson, Jr., Assistant United States Attorney for the Northern District of West Virginia, do hereby certify that the foregoing MOTION TO DISMISS AND MOTION FOR JUDGMENT ON THE PLEADINGS and MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT were served via Federal Express and by United States mail, postage prepaid, as follows:

> Steven J. Silverberg, Esq.
> 1819 L Street, NW
> Suite 700
> Washington, DC 20036
> (Via Federal Express)
>
> Mark Jenkinson, Esq.
> BURKE, SCHULTZ HARMAN & JENKINSON
> 85 Aikens Center
> P. O. Box 1938
> Martinsburg, WV 25402
> (Via U. S. Mail)

on this 4th day of April, 2005.

Daniel W. Dickinson, Jr.
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FILED**

APR - 4 2005

U.S. DISTRICT COURT
WHEELING, WV 26003

| | |
|---|---|
| HAWEY A. WELLS, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| ANTHONY J. PRINCIPI, SECRETARY, | ) |
| DEPARTMENT OF VETERANS AFFAIRS, | ) |
| | ) |
| Defendant. | ) |

**CIVIL ACTION NO. 3:03-CV-38
(BROADWATER)**

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

### STATEMENT OF THE CASE

In this civil action, Plaintiff alleges that he has been subjected to unlawful employment discrimination on the basis of his age and gender; was subjected to a hostile work environment on the basis of his age and gender; and was discriminated against or on account of his participation in the equal employment opportunity process. His Complaint asserts Defendant's actions of and toward Plaintiff violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, 42 U.S.C. § 1981 and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 1621, *et seq.* Plaintiff seeks $300,000 in damages, payment of his costs of litigation and attorney fees, the restoration of his hospital privileges in psychiatry, and reinstatement to his duties and, as well, an order enjoining the Defendant from further discriminating against the Plaintiff.

Prior to commencing this action on or about November 1999, Plaintiff filed the first of two EEO complaints of discrimination, alleging that commencing in June 1999, Defendant, due to

Plaintiff's age and sex, discriminated against him and harassed him in his employment.  This

complaint was dismissed without decision on the merits on or about June 27, 2001.  A Final Agency

Decision finding no discrimination was issued on August 16, 2001.  Plaintiff appealed that decision

and on February 26, 2003, the EEOC affirmed the Final Agency Decision.  Plaintiff filed a second

EEO complaint on February 22, 2002, alleging that since June 2001, the Defendant discriminated

against him in his employment by reason of his age, sex, and prior EEO activity.  As with the first

claim, the second claim was appropriately investigated.  However, no action was taken within 180

days of the final of the second EEO complaint. *See* Cmplt, Supp. Cmplt and Ans.  To this date, the

Plaintiff retains a rating of Grade 15, Step 10.  He has, however, been subsequently assigned for cost

purposes to the domiciliary and then, finally, to the Mental Health Service Line.  Exh. 1, Seal Decl.

STATEMENT OF FACTS

The Plaintiff Hawey A. Wells commenced his employment with the Defendant on

January 19, 1993, at Defendant's Veterans Affairs Medical Center, Martinsburg, West Virginia

(MVAMC).  His initial appointment was as a staff physician in the drug and alcohol section of the

psychiatric service.  In following years he was subsequently assigned to the domiciliary service and

then, finally, to the mental health service line.  His Official Personnel File (OPF) contains no

evidence that he served as Assistant Chief of Addiction Medicine and shows his initial grade for

salary purposes was set at Chief grade, Step 10, and remains unchanged.  Exh. 1, Seal Decl.

Subsequent to his graduation from medical school, the Plaintiff participated in and completed

a four-year residency program in the medical specialty of pathology.  Exh. 2, Wells Dep. 14, 15.  It

appears from the relevant records that other than in pathology, Plaintiff Wells engaged in no

additional formal residency training.  Exh.3, Blake Decl. ¶ 3.  In 1989, he became certified by and

2

a member of the American Society of Addiction Medicine (ASAM).  Certification by ASAM

required no formal hospital residency program but did require a concentration of practice in the area

of addiction medicine.  Exh. 2,Wells Dep. 17, 18.  The American Board of Medical Specialties

(hereafter ABMS) recognizes only medical specialty boards as members which boards require formal

residency programs.  ASAM is not a member board recognized by the ABMS.  Exh. 2, Wells Dep.

20, 21.  Addiction medicine is not a specialty recognized by the Defendant.

Soon after coming to practice at MVAMC, Plaintiff was granted privileges to practice

medicine in psychiatry.  To explain this anomaly, the Plaintiff states that the MVAMC had no

separate privileges for addiction medicine separate from psychiatric privileges and, therefore, he was

privileged to practice psychiatry based upon his experience and training in addiction medicine, not

upon training in psychiatry.  Exh. 2, Wells Dep. 38.

In 1999, the year in which the Plaintiff alleges the commencement of discriminatory conduct

toward him, the Plaintiff was serving at MVAMC in its substance abuse unit, which unit is part of

MVAMC's domiciliary care program (DOM) known as CAT-5 (Center for Addiction Treatment).

The DOM is a critical and major component of the MVAMC.  In addition to the CAT-5 program,

it encompasses a residential rehabilitation program for PTSD patients, a brain injury rehabilitation

unit, homeless veterans program and a health maintenance program.  The DOM programs are located

within the main hospital building and, as well, in two connected and adjacent buildings.  The CAT-5

program included a 77-bed unit and medical clinic, located in one of the aforementioned adjacent

buildings and also included a detoxification (detox) unit which consisted of eight beds and was

located on the sixth floor of the hospital building.  Exh. 4, Smits Decl. ¶ 4, 7.  As the physician

attending in CAT-5 or DOM substance abuse program, the Plaintiff was responsible for admissions,

3

sick call, discharge summaries, supervising a physician's assistant (hereinafter "PA"), and, as well, medically managing emergency or urgent problems with specific emphasis on medical problems that interfered with patient treatment in the substance abuse program. Exh. 5, Haber Affd. 2, 12. The Plaintiff conducted an outpatient clinic on Wednesday afternoons which was an after-care clinic comprised of recovering people as well as dual diagnosis patients. Exh. 2, Wells Dep. 97. The detox unit was and is located on the sixth floor of the main hospital, along with the acute psychiatry ward. Exh. 2, Wells Dep. 93, 94. One full-time PA is assigned to this detox ward. In recent times, the detox admissions were dropping. The occupancy rate of the ward was under 60 percent and the average length of stay barely exceed three days. Exh. 6, Smits Affd. 11/7/2000, 17, 18 (Smits Affd. '00).

The patients the Plaintiff attended to in the substance abuse program were typically long term abusers, addicted to more than one drug, including alcohol, some being dually diagnosed with addiction problems and psychiatric disorders. Not only did these patients present diagnostic difficulties within the addiction and psychiatric realm, but they present with a high incidence of medical disorders such as Hep C, HIV, drug resistant tuberculosis, along with cancers, heart disease and infectious disease difficulties. Exh. 2, Wells Dep. 105-112.

The MVAMC is a part of a regional network known as VISN-5 (Veterans Integrated Service Network), which network includes all of the Defendant's facilities in Maryland, Washington, D.C., and the Defendant's hospital at Martinsburg, West Virginia. The function of the VISN is to facilitate and coordinate veterans' health care within a regional grouping of providers and institutions. Service lines have been established within VISN groupings, the directors of which report to the VISN network director. A mental health service line began in VISN-5 effective January 2000. Exh. 7,

4

Nocks Decl. ¶ 3. Dr. Stephen Deutsch, a board-certified psychiatrist, was the director of the VISN-5 mental health service line and, as such, had authority for budget and personnel issues within that service line. Each major facility then had a mental health service line manager who, with hospital administration, was responsible for the day-to-day operations within a given medical center. Exh. 8, Deutsch Dep. 6, 30-33. Dr. Deutsch describes the mental health service line as integrating a variety of professional disciplines which are involved in mental health. This integration includes social work, psychology, clinical nurses, and psychiatrists with the purpose of effectively utilizing resources. Exh. 8, Deutsch Dep. 9. Dr. Deutsch further establishes that the mental health service line facilities manager at MVAMC is Paul Smits. Exh. 8, Deutsch Dep. 46

During the times relevant to the Plaintiff's Complaint, that is to say, since June of 1999, Plaintiff has at all times been supervised in his clinical work by another physician. Until mid summer 2000, his ultimate supervisor for clinical activities was Dr. S. Kodali, the Chief of Psychiatry. Until about September 2001, his clinical issues were immediately supervised by Dr. Richard Haber, a board-certified psychiatrist. Soon after September 2001, Dr. J. Hill, also a board-certified psychiatrist, became acting (eventually) Lead Psychiatrist. Concurrent with this clinical supervision, the program or administrative functions of his duties had been supervised by Dr. Michael McCarty, Ph.D., coordinator of the DOM-based CAT-5 program since 1991 and by Michelle Cooke, Program Coordinator of Mental Health Clinics. Since 1993, Mr. Paul Smits was Chief of domiciliary programs, which programs included all five DOM programs, including the CAT-5 program. On January 1, 2000, the VISN-5 mental health service line became fully operational and Mr. Smits was appointed Facilities Manager of that service line. This added the

5

duties of managing all outpatient and inpatient mental health services to Mr. Smits responsibilities. Exh. 4, Smits Decl.

Late in the year 2000, an ugly and disturbing event occurred involving a female geriatric patient. This person sustained extensive bruising while a psychiatric patient at MVAMC. This occurrence was the cause of intense investigations conducted, in part, by a panel of persons from outside of the MVAMC and which had been commissioned by Dr. Stephen Deutsch. Exh. 8, Deutsch Dep. 132, 136. Dr. Deutsch monitored the investigation by traveling to Martinsburg and by reviewing its reports. Exh. 8, Deutsch Dep. 138, 139. A conclusion of the direct causation of the patient's injuries was not reached. As a result, however, the investigations caused important matters of concern to be recognized, which matters were related to the training of staff, the excessive use and reliance on restraints, and lack of diligence. Exh. 8, Deutsch Dep. 130, 133. As impacts this case, that investigation drew attention to Dr. Wells' being privileged to practice psychiatry without proper credentials and being trained in pathology and not being trained in any direct care patient specialty. Exh. 8, Deutsch Dep. 143. Dr. Wells' certification by ASAM was considered not to be one conferred after completion of a residency program nor was that certification recognized by the VA. Exh. 8, Deutsch Dep. 147. It was obviously important to have physicians properly credentialed to meet their privileges. Exh. 8, Deutsch Dep. 165.

Prior to any changes being made to accommodate Dr. Wells' obvious lack of appropriate psychiatric education, he was afforded time to provide additional proof of psychiatric training. Exh. 2, Wells Dep.188, 189, 192, 193. Upon the basis of the report of investigation and after review of Plaintiff's credentialing and privileging file, and since he had not provided evidence of additional education, he was notified by Dr. Haber that he would no longer serve on psychiatric on-call duty

6

and would attend detox patients less frequently.  Exh. 9, Smits Affd. 1/17/03 (Smits Affd. '03).  In December 2001, Dr. Wells was notified that due to his lack of formal psychiatric training, his assignment was attending primary care patients of the CAT-5 program. Exh. 8, Deutsch Dep., Exh. 3.  In this assignment, he remained within the mental health service line working with substance abuse patients.  Exh. 9, Smits Affd. '03 7, 8.  Dr. Wells continued to provide an after-care clinic to outpatients on Wednesday afternoons.

It is important to note that the partial shift in Plaintiff's assigned duties did not result in nor include a revocation, suspension, or reduction of his psychiatric privileges at MVAMC.  In fact, his privileges in psychiatry were recently reviewed in September 2004 and are effective through September 16, 2006.  Exh. 3, Blake Decl, ¶ 2.  In or about October 1, 2001, the DOM CAT-5 medical clinic was relocated from an adjacent building to the third floor of the main hospital.  This floor already housed the DOM general medical clinic.  The entire CAT-5 clinic was moved to the new building, including the Plaintiff, the nursing staff, and the PA.  Exh. 9, Smits Affd. '03 7, 8.

### ARGUMENT

Summary judgment is appropriate according to Fed.R.Civ.P. 56(c) "if the pleadings, depositions, answer to interrogatories, and admissions of fact, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

In *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), the Supreme Court further clarified that summary judgment is appropriate in a case where the non-moving party " . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  The Fourth Circuit Court of Appeals has

7

acknowledged that while the facts must be viewed in the light most favorable to the non-moving

party, *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986): "The Court,

however, has an affirmative obligation to prevent factually unsupported claims and defenses from

proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *Bernard*

*v. Calhoon Meba Engineering School*, 309 F. Supp 2d. 732, 733 (D.C. Md. 2004).

Title VII prohibits discrimination in employment on the basis of sex (42 U.S.C. § 2000e-2)

and prohibits an employer from taking adverse employment actions against an employee in order to

"retaliate" against an employee for taking or engaging in EEOC actions.   42 U.S.C. § 2000e-3.

Likewise, the Age Discrimination in Employment Act ("ADEA") requires that personnel actions

affecting federal employees who are at least 40 years of age be "made free from any discrimination

based on age." 29 U.S.C. § 633a.

The allocation of proof in employment discrimination cases applicable both to claims of

discrimination and retaliation is well established. Under *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), a

plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence.

*Haleperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997). In the event the plaintiff makes

a *prima facie* showing, the burden then shifts to the defendant who must articulate a legitimate

nondiscriminatory reason for the adverse employment action. *Burdine*, 450 U.S. at 254. The burden

then shifts back to the plaintiff to demonstrate that the employer's reason is false or pretextual and

that the real reason for the unlawful action was discrimination. *St. Mary's Honor Center v. Hicks*,

509 U.S. 502 (1993).   Nonetheless, the "ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

*Burdine*, 450 U.S. at 253.

<u>Plaintiff's Burden of Proof in His Claims of Disparate Treatment and Retaliation</u>

Plaintiff must prove his allegations of retaliation in violation of Title VII and the ADEA by showing that (1) he engaged in protected activity; (2) he suffered adverse employment action; and (3) the adverse action was taken because of the protected activity. *Bryant v. Aiken Regional Medical Center, Inc.*, 333 F.3d 536, 543 (4th Cir. 2003). To prevail upon his Title VII claims of sex discrimination and his ADEA age discrimination claim, it is his burden to prove (1) that he was a member of a protected group; (2) he suffered an adverse employment action; (3) he met his employer's legitimate job expectations at the time of the adverse employment action; (4) that similarly situated employees outside the Plaintiff's class received more favorable treatment.

Counts One and Three of Plaintiff's Complaint allege that Plaintiff was discriminated against on account of his age and sex in that younger persons and females who were similarly situated were treated differently. Count Five asserts that Plaintiff was, in part, discriminated/retaliated against because of his participation in the EEO process by subjecting him to disparate treatment. Plaintiff maintains that the factual allegations set forth in paragraphs 7-41 of the Complaint support his assertions.

<u>Plaintiff Cannot Establish a *Prima Facie* Case of Age Discrimination or Retaliation Since He Did Not Experience an Adverse Employment Action.</u>

To sustain his burden of proof in both his claims of age discrimination and retaliation, Plaintiff must establish that there has been an employment action that had an adverse effect on the

terms, conditions, and benefit of his employment. *Von Gunten v. Maryland*, 243 F.3d. 858, 866 (4th Cir. 2001).

Upon reading Plaintiff's list of events that allegedly occurred in the course of his employment with Defendant in the approximate 30-month long period of time extending from June 22, 1999, to February 22, 2002, as appears in his Complaint of Employment Discrimination ("Complaint"), it becomes clear that he suffered no adverse employment actions because none of the alleged occurrences had an adverse effect upon the terms, conditions, or benefits of his employment. In main, the Plaintiff complains of the following actions: In July of 1999, a non-physician, Mr. Paul Smits, took over the substance abuse program and became Plaintiff's supervisor; in September of 1999, Plaintiff was informed that his immediate supervisor, a psychiatrist, would no longer be his supervisor and that his wards and clinics would be supervised by a younger, inexperienced psychologist; Plaintiff's level of duties were eliminated or reduced in the substance abuse program, leaving Plaintiff to perform essentially the duties of a PA; Plaintiff was, because of the removal of a psychiatrist supervisor from substance abuse duties, providing medical care to patients on a detox ward, an outpatient clinic, and a 70-bed residential unit; Plaintiff was often faced with a choice of working late or not properly caring for his patients; Plaintiff was scheduled to one hour per day for chart dictation and one hour per day for recording his workload, which Plaintiff asserts were insufficient amounts of time to do both; he did not have time to review the work of PAs. Plaintiff further alleges that he was subjected to various insults, among those: He was wrongfully admonished for being AWOL; his office was relocated three times in three months; he was denied a personal computer; he was forced to resign from the Education Committee, from organizing grand rounds, from Research and Development Committee activities, and from going to Budget Committee

10

meetings; he was moved to a smaller office; because his charts were not "up-to-date," he was subjected to threats of "professional review" of his charts; he was required to walk extensively between units to care for his patients; his workload was increased; his duties in acute psychiatry were removed and he would no longer be taking psychiatric on-call; his office was moved without notification; his psychiatric privileges were removed; he was assigned to internal medicine and his duties were to do patient "work-ups" previously performed by nurses; he was given a negative performance review; he was wrongly accused of a violation of the Hatch Act; his workload was improperly recorded. Cmplt. ¶¶ 7-14.

Important to an analysis of his claims, it must be noted that the Plaintiff remains employed as a physician in the mental health services of the Defendant's Medical Center, Martinsburg, West Virginia. He has not been demoted. He remains at the same salary grade and step. Exh. 1 Seal Decl., ¶ 3. His privileges to practice psychiatry at MVAMC have not been removed or reduced and are effective until September 16, 2006. Additionally, the National Practitioner Databank has no information on file regarding the Plaintiff. Exh. 3, Blake Decl., ¶ 2. In part, however, his assigned duties have changed. In 1999, Plaintiff attended patients in the substance abuse program. Exh. 5, Haber Affd. 2, 12. In that role, he was responsible for admissions, he conducted sick call, completed discharge summaries, order consults, prescribed drugs, including psychotropic drugs, and as well managed the patients' urgent and emergent problems. Exh. 2, Wells Dep. 142, 143. The substance abuse patients suffer from a variety of addiction disorders, including being dually diagnosed with psychiatric difficulties, are often cross-addicted and as well have serious physical disorders, such as Hep C, HIV, drug resistant TB, heart disease, and cancer. Exh. 2, Wells Dep. 106, 108, 127, 128. As a result of an incident alleging patient abuse, an investigation occurred wherein, among many

11

other things, it was noted that Plaintiff lacked credentialing and education in psychiatry. (This investigation and its findings were more fully discussed in the above sections.) Therefore, beginning in mid-year 2001 and finalized in December 2001, his duties were rearranged so that his time became utilized for caring primarily for the CAT-5 medical clinic patients. Exh. 8, Deutsch Dep., Exh. 3. Since that rearrangement of duties, Plaintiff attends to the same group of complex patients having addiction problems, psychiatric difficulties, and serious physical problems. Exh. 2, Wells Dep. 185. He continues to do admissions, discharges, orders, consult, prescribing psychotropic drugs after consult, and as well conducts sick call and medically manages those patients' physical disorders so those disorders do not interfere with a patient's recovery. Exh. 2, Wells Dep. 184.

While Dr. Wells continues to conduct a Wednesday afternoon outpatient after-care clinic, he no longer provides professional services to the Detox Unit, nor is he on psychiatric on-call. Exh. 2, Wells Dep. 191, 192.

This realignment affected only a minority of Plaintiff's duties. His schedule that had been formulated by agreement devoted only two hours per day for the Plaintiff to serve in the detox unit. Exh. 5, Haber Affd., 2. Only eight beds were devoted to the detox unit, with the average length of stay for a patient being 3.2 days, and it was rare that this unit was occupied by eight patients and was actually minimally occupied by two or three.  As well as the Plaintiff, it was staffed by an experienced PA, Mr. Mullinix. Exh. 4, Smits Decl., ¶ 7.

While this partial realignment of duties may have removed functions from his practice that he preferred, thereby making his job less attractive to him, it did not negatively impact the terms, conditions, or benefits of it and, therefore, does not constitute an adverse employment action as is necessary for an actionable Title VII violation. In this Circuit, it is recognized that ". . an employee's

dissatisfaction with this or that aspect of work does not mean an employer has committed an actionable adverse action." *James v. Booz-Allen & Hamilton*, 368 F.3d 371, 377 (4th Cir. 2004). While a job reassignment, if truly significant, may rise to be an adverse action without a decrease in pay and benefits, and without a showing the employee became stifled in advancement or became exposed to more hazardous assignment, simply an assignment that is less appealing to the plaintiff does not constitute an adverse employment action. *Von Gunten,* 243 F.3d at 868.

In February 2002, the Plaintiff's work performance for the year 2001 was routinely evaluated by his clinical supervisor, Dr. Hill. The Plaintiff contends that this was a negative evaluation of his performance because of the comments appearing at item 17 on the Proficiency Report, which comments are "Dr. Wells has been late in dictating discharge summaries. There have been occasional reports that he has been difficult to find during working hours." Exh. 2, Wells Dep. 193-196, Exhs. 2 and 3. In comparing the 2002 Proficiency Report with the 2001 Proficiency Report, the Plaintiff admits they are scored the same and that the overall rating was the same for both years. Exh. 2, Wells Dep.195, 196. Interestingly, the report from the prior year also contains a comment regarding the tardiness of his discharge summaries. Exh. 2, Wells Dep., Exh. 2, line 13. Plaintiff makes no showing that the 2002 performance evaluation, which he believes was negative, was used to adversely affect the terms, conditions, and benefits of his employment. Accordingly, even if it were a negative evaluation, it is not actionable as an adverse employment action since it has not been used by Defendant to negatively affect the terms, conditions, and benefits of Plaintiff's employment. *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371 (4th Cir. 2001), citing *Von Gunten v. Maryland*, 243 F.3d at 87, citing *Spears v. Missouri Dep't. of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000).

13

A similar analysis is conducted to determine whether or not a disciplinary action taken by an employer rises to the level of an adverse employment action.  Upon reviewing a disciplinary discussion prompted by plaintiff's conduct and a second disciplinary action taken when plaintiff left his work station without authorization, the Fourth Circuit determined these incidents did not constitute an adverse employment action.  In applying *Von Gunten*, 243 F.3d 858, the Court determined that the disciplinary action did not result in a negative effect upon plaintiff's terms, conditions, and benefits of employment and were expunged from the record. *Thompson v. Potomac Electric Power*, 312 F.3d 645 (4th Cir. 2002).

The Plaintiff alleges that he was admonished or accused of being AWOL and also for a violation of the Hatch Act.  Relating to these assertions, plaintiff acknowledged that he emceed a political rally at noon and introduced Senator Byrd and Senator McCloskey and that he was late coming back to the hospital. Exh. 10, Wells Affd. 12/11/02 (Affd. '02), 25, 26. In actuality, Plaintiff was not admonished or accused.  Rather, only a "verbal counseling" occurred wherein he was cautioned that his actions may have violated the Hatch Act and that he had twice been absent without taking leave.  No record of this occurrence was placed into his personnel file.  Exh. 4, Smits Decl. ¶16.

Plaintiff alleges that he was threatened with a "professional review" of his patient charts because they were "not up to date."  Complaint, para. 23.i.  This appears not to have been a threat of discipline, but due to Plaintiff's tardiness in doing discharge summaries, it was either a peer review matter or a review done by medical record folks. Exh. 2, Wells Dep. 156, 157.  If indeed such a review occurred, he makes no showing that it had any negative impact on his employment conditions.

Nevertheless, since there is no showing that these verbal counseling warnings or reprimands negatively affected the terms, conditions, and benefits of his employment, they do not constitute events of adverse employment action.

The Plaintiff alleges that commencing in June of 1999, he had been forced to resign from the Education Department, from grand rounds and, additionally, had to quit going to Budget Committee meetings and had no time for participation in the Research and Development Committee and that this increased scheduling load was, in part, created by Paul Smits' need to fill beds. This acceptance of inappropriate patients increased the Plaintiff's workload. Exh. 11, Wells Affd. 11/2/00 (Affd. '00), 3, 4. The Plaintiff asserts that Dr. Michael McCarty, a psychologist, was put in charge of the wards and clinics serviced by the Plaintiff and that Dr. McCarty was inexperienced in scheduling and providing backup care for patients, thereby causing Dr. Wells to be faced with either working late or providing inadequate care. This, according to Dr. Wells, occurred concurrently with Dr. Richard Haber changing responsibilities and leaving only Dr. Wells to cover the detox unit, residential treatment unit, and his outpatient clinic, duties which Wells claims had historically been performed by two doctors and two PAs. This left Dr. Wells, in his view, as having had his duties systematically reduced to such a degree that he was only doing what a PA does. Exh. 11, Wells Affd.'00, 5, 8. Dr. Wells further complains that even though Dr. Haber had eventually taken charge of scheduling employees' leave, there was no proper backup system in place. Exh. 11, Wells Affd. '00, 9. Dr. Wells contends that he was required to spend an hour a day updating his charts and an hour a day recording his workload. That left him no time to appropriately review the work of PAs. According to Dr. Wells, the problem with doing discharge summaries was that the number of irregular discharges had increased and his time became filled with doing medical work. He also asserts that

15

the recording of his workload was improper, making it appear as though he had a smaller patient load than he actually had, and that Dr. Haber continually asked about his workload. Exh. 11, Wells Affd. '00, 10, 12, 14, 15. This is a unique complaint, since the Plaintiff was, by agreed schedule, accorded an hour a day for recording his own workload. It is fair to state that if an entry was incorrect, it was incorrect by his own effort.

Dr. Wells was required to walk between units, that is to say, from the CAT-5 medical clinic in one building to the sixth floor in the adjacent main hospital building so as to attend to patients in the detox unit. Dr. Wells stated that several trips a day were necessitated which affected him physically because of his bad foot, hip, and back. Exh. 11, Wells Affd. '00, 18. Finally, Dr. Wells asserts that he was not given a personal computer when younger people, including PAs, received them.

This laundry list of Plaintiff's complaints seemingly extends over an 18-month period, from June 1999 until, perhaps, the last quarter of 2001, at which time the clinic in which he worked was relocated to the third floor of the hospital. A realistic examination of this group of complaints gives the clear view that Dr. Wells was displeased with being supervised by a psychologist; felt that his workload was too great; that he chose to resign from duties not related to patient care; and that, generally, he was displeased with the evolution of his practice.

Viewing these allegations in a light most favorable to the Plaintiff, less desirable work assignments which do not amount to a downgrading of Plaintiff's position and wages, or which do not subject him to more dangerous conditions than his co-workers, are not adverse employment actions for the purposes of Title VII. *See Von Gunten*, 243 F.3d at 867-68; *Gilliam v. Principi*, 2003

16

WL 2006844 at * 8 (M.D.N.C. April 28, 2003) (unpublished) holding at "assignment to an unwanted job duty without financial repercussions is not an adverse employment action."

This litany of complaints does require at least a partial examination of the underlying facts. In 1999, Dr. Wells was, indeed, a physician attending to residential inpatients of the DOM substance abuse program. Exh. 5, Haber Affd. 3, 12. He also saw detox patients and since the units were in different locations, it was necessary that he walk between them. This travel, of course, ended with the consolidation of the medical clinics.

Most certainly, issues involving scheduling and backups did arise and solutions were sought by combinations of those concerned, namely, McCarty, Haber, Wells, and Cooke. Dr. Haber shifted positions and changed locations in 2001, but he remained the Plaintiff's clinical supervisor. Exh. 4, Smits Decl. ¶9. Dr. Haber coordinated leave for himself, Wells, and the two PAs (Rick Allison in substance abuse; Randy Mullinix in detox) so as to enable cross-coverage under an arranged system. Exh. 5, Haber Affd. 3 8. The goal was to cover detox, meet the CAT-5 clinic needs, and not "make Dr. Wells crazy with excessive burdens. . ." Exh. 5, Haber Affd. 4. A year was spent working out the details "to make flow of services and coverage possible." Exh. 12, McCarty Affd. 3 5. They also sat down and worked out coverage issues arising when one person was out. Haber, McCarty, Allison, Mullinix, and Wells all had to, from time to time, work over. Exh. 12, McCarty Affd. 10, 12.

Dr. Wells' work schedule was agreed to by himself, Cooke, Haber and McCarty. It gave him a daily block of time in detox so to stop the necessity of his multiple trips. Exh. 12, McCarty Affd. 15. Time was also arranged at the beginning and ending of each day for Dr. Wells to do discharge

summaries and workload reporting, as well as two hours per day to be in detox. Exh. 5, Haber Affd. 2, 10, 11; Exh. 13, Cooke Affd. 10/00 (Affd. '00) 5, 6; Exh. 14, Cooke Dep. 25.

The staffing levels for the substance abuse program (CAT-5) and for detox from January 1999 forward was: one full-time physician, one full-time PA for detox, one full-time for PA for CAT-5, and two nurses. No reduction in full-time staffing occurred. Exh. 4, Smits Decl., ¶¶ 4, 7, 12. After transferring from Chief of Substance Abuse to Lead Psychiatrist, and during the transition period, Dr. Haber, in addition to providing cross coverage and backup for Dr. Wells, did the psychiatric consultations for the CAT-5 program and followed the more complicated psychiatric patients and, as well, did consults for detox. Dr. Haber claims this accounted for about one-half of his time when he was working in the CAT-5 program. The PA generally did half of the discharge summaries, which were basically a cut and paste operation. Exh. 5, Haber Affd. 9, 12, 13. The detox discharges were done primarily by the PA, not by Dr. Wells, while the PA also did admissions to the CAT-5 program. Exh. 12, McCarty Affd. 9, 12.

By way of comparison, Dr. Santos was covering the 312-bed DOM care clinic with two PAs, while Dr. Wells covered only the 70-bed CAT-5 residential clinic and detox with two PAs. Exh. 6, Smits. Affd. '00, 17. Although approached, his supervisors were unable to support and document his claimed overburden. Exh. 5, Haber Affd 15. In fact, some over-inflation in his claims was noted. Exh. 12, McCarty Affd, 8 and Exh. 13, Cooke Affd. '00, 7, 8.

Plaintiff further claims that he had to resign from certain committees and from organizing grand rounds. He claims that "Dr. Haber said Paul would support your resigning from these committees." But he also claims his schedule forced his resignation. Exh. 2, Wells Dep. 153; Exh. 11, Wells Affd. '00, 4. Mr. Smits plainly denied removing him from any committees with the

18

exception of those that Dr. Wells requested to be relieved from, those being his supervising PA

students and interns.  It also appears that grand rounds was primarily organized and operated by a

PA.  Exh. 6, Smits Affd. '00, 10, 11.

With respect to Plaintiff's claims, the record clearly reflects that none of the actions about

which he complains are sufficient to state a *prima facie* case of either discrimination or retaliation,

since he has not experienced nor suffered any type of adverse employment action.  As cautioned by

the District Court for the District of Maryland, in evaluating the evidence of a plaintiff's *prima facie*

case, "it must be recalled that Title VII's protections do not insulate one from either the normal day

to day dissatisfactions and annoyances commonly arising in any workplace." *Settle v. Baltimore

County*, 34 F.Supp.2d 969, 991 (D.Md. 1999).   Nor are "trivial discomforts endemic to

employment." *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999).

<u>Plaintiff Cannot Establish a Prima Facie Case of Gender Discrimination
Since He Did Not Experience an Adverse Employment Action.</u>

"Employment discrimination laws require as an absolute precondition to suit that some

adverse employment actions have occurred." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th

Cir. 1985), *cert. denied*, 475 U.S. 1082 (1986).   The question of what constitutes adverse

employment action was contemplated by the Fourth Circuit in *Von Gunten*, 243 F.3d at 866, quoting

*Munday v. Waste Mgmt. of North America, Inc.*, 126 F.3d 239, 243 (4th Cir. 1987) and the court

concluded that "adverse employment action includes any retaliatory act or harassment if, but only

if, the act or harassment results in adverse effect on 'terms, conditions or benefits' of employment."

Plaintiff alleges that he was disparately treated and discriminated against because of his

gender and that the discriminatory conduct was that of Michelle Cooke.  Exh. 2, Wells Dep. 166,

19

167. He contends Michelle Cooke's discriminatory conduct was as follows: His office was moved in October 2001 without warning Exh. 10, Wells Affd.'02, 18, 19; in January 2002, Ms. Cooke again reassigned the CAT-5 clinic's nurses; on January 29, 2002, without his knowledge, his office was moved. Exh. 10, Wells Affd. '02, 23; finally ". . . she absolutely mistreated me . . ." , she is "buddy buddy with the females and sort of ignores me." She asks female nurses and female assistants about his activities. Exh. 10, Wells Affd. '02, 31. Additionally, Plaintiff claims that Ms. Cooke spoke to the two female doctors but not to him and, in fact, communicated with him only by e-mail. Exh. 2, Wells Dep. 168, 169.

In January 1998, Michelle Cooke became Mental Health Clinical Coordinator at the MVAMC and, in that position, she was responsible for the management of the outpatient mental health clinics and the medical clinic for domiciliary patients. She supervised 29 people, five of whom were physicians who were, however, at all times clinically supervised by other physicians. In this function, she was supervised by Mr. Paul Smits. Exh. 14, Cooke Dep. 6-10. Until 2001, when the CAT-5 clinic (DOM substance abuse clinic) moved to the same location as the general DOM medical clinic, her only supervisory responsibilities toward the Plaintiff was the supervision of his Wednesday afternoon outpatient clinic. In October 2001, the substance abuse medical clinic (CAT-5) in which the Plaintiff worked was moved from its "DOM" location to the third floor of the main hospital, along with the general DOM medical clinic. The entire CAT-5 clinic was moved, including Dr. Wells, a physician assistant, and the nursing staff. Exh. 9, Smits Affd. '03. The Plaintiff was aware for months of this clinic consolidation. He endorsed it and benefitted by it, for his practice became largely conducted on the third floor and it removed any requirement that he

walk. Exh. 2, Wells Dep. 178-180.  Prior to the move, Dr. Wells was shown his new offices and participated in choosing the decorations. Exh. 14, Cooke Dep. 44.

Upon consolidation of both medical clinics on 3A of the hospital, nursing staff from both were "pooled" to render services to all medical providers of the consolidated clinic, and the substance abuse clinic retained the same level of nursing support it had prior to the consolidation. Exh. 4, Smits Decl. ¶.  Michelle Cooke, then Plaintiff's program/administrative supervisor, unequivocally denies that he was assigned duties such as patient workups that previously were performed by nurses. Exh. 14, Cooke Dep. 74.

A second office move occurred in January 2002.  Rooms the Plaintiff used on the sixth floor were needed for another occupant, and he was notified that his personal effects would be moved. One of those rooms remained available to him for the operation of his Wednesday afternoon clinic. Exh. 14, Cooke Dep. 42, 43.

Plaintiff's claim of gender-based discrimination fails because he cannot demonstrate the existence of an adverse job action, since none of the conduct he alleges affected the "terms, conditions, or benefits of employment."  Rather, Plaintiff's contentions at worst are simply those daily annoyances found at any job site.  Such "trivial discomforts endemic to employment" do not serve as adverse employment actions.  *Boone v. Goldin*, 178 F.3d at 256; nor does uncivil and uncomfortable treatment by co-workers.  *Matvia v. Bald Head Island Management, Inc.*, 259 F.3d 261, 272-72 (4th Cir. 2001);

Plaintiff Was Not Treated Disparately
Due to Retaliation or Discrimination

Plaintiff is likewise unable to demonstrate that the events of which he complained were based upon his age, sex, or retaliation. Regarding his claims of gender discrimination, the events of which were discussed immediately above, he supports these claims solely by the actions of Michelle Cooke. Plaintiff, however, readily admits that there were no gender-based statements made to, about, or directed at him, merely that Ms. Cooke treated female physicians differently than him. Exh. 2, Wells Dep. 165-169.   These incidents, in the harshest of light, cannot be deemed to be acts of discrimination or retaliation.   At worst, they are merely inaccurately depicted trivialities that commonly occur in a workplace environment.

Upon the training, education, and competencies of the MVAMC mental health staff becoming reviewed as a result of investigations into an alleged event of patient abuse, it became a matter of concern that Plaintiff was practicing psychiatry when he was trained in pathology, not trained in a direct care-related specialty, had not participated in a formal residency program in addictions medicine, and had no formal training in psychiatry. Exh. 8, Deutsch Dep. 141, 143, 145, 146. Due to his lack of appropriate training, his medical practice assignments were rearranged to halt his duties in psychiatric on-call and his duties in detox and placing him full time working with substance abuse patients in the CAT-5 medical clinic. Exh. 9, Smits Affd. '03.

He alleges that younger persons and females who were not board certified continued to be permitted to practice psychiatry.   He identifies those persons as Drs. Amanullah, Asghar, and Sompali. These physicians were not, however, similarly situate to the Plaintiff. Dr. Amanullah completed a four-year residency program in psychiatry, a one-year fellowship concentrated in the

22

use of medication in the treatment of addiction patients, and is fully board-certified in psychiatry. Exh. 15, Amanullah Decl.  Dr. Asghar, approximately age 55, completed a residency in psychiatry and is board eligible in psychiatry.  Exh. 16, Asghar Decl.  Dr. Sompali, age 50, is fully trained in neurology and, in the course of his neurological residency, he engaged in a program in psychiatry.

Plainly, these physicians possess either board certification, board eligibility, or educational and training experience that qualifies them to practice in psychiatry at MVAMC and, accordingly, none of them are similarly situate to Plaintiff.  In addition, Drs. Asghar and Sompali are in the same protected age group (over 40) as is the Plaintiff.

Dr. Wells contends he was refused a personal computer by Dr. McCarty sometime in 1999-2000.  He claims Dr. McCarty gave them to everybody (younger) but him. At the time, only "dumb stations" were available.  Exh. 2, Wells Dep. 150, 151.  Dr. McCarty confirms that until October 2000, the CAT-5 clinic did not have PCs but used "dumb terminals"; when PCs became available, all medical staff, including the Plaintiff, got one. Exh. 12, McCarty Affd. 18, 19.

<u>Defendant Had Legitimate, Non-Discriminatory Reasons for its Conduct</u>

Assuming only for the sake of argument that Plaintiff could establish a *prima facie* case of discrimination or retaliation, the burden would shift to the Defendant to articulate some legitimate, non-discriminatory reason (s) for its conduct. *St. Mary's Honor Center v. Hicks*, 509 U.S. at 507-508. Such reasons are abundant here.  Having been discussed above, they need not be repeated here. Accordingly, Defendant has met its burden of coming forward with legitimate, nondiscriminatory reasons for its conduct of which Plaintiff complains.

<u>Plaintiff Has Failed to Prove That Defendant's Reasons</u>
<u>for its Conduct was Pretextual and That His Age, Gender and</u>
<u>Protected Activity Were the True Reasons</u>

Even if Plaintiff has established a *prima facie* case (which he has not), summary judgment

should still be granted for this Defendant because Plaintiff has failed to present evidence that

Defendant's explanations for its actions were a pretext for discrimination/retaliation against him.

Plaintiff's first in time, and seemingly primary cause of action, is his claim that Defendant

discriminated against him because of his age in violation of the ADEA. The suppositions upon

which he bases his ADEA claim are, in a nutshell, that because of his age he was highly paid and the

Defendant's VISN -5 organization wanted to save money by hiring younger, less expensive

physicians. He asserts that immediately prior to the formation of the VISN-5 mental health service

line, Dr. S. Kodali applied for the Director's position and in the application process became a

confidante of Dr. Nocks, the VISN-5 Director. Dr. Wells reports that Dr. Nocks disclosed plans to

Dr. Kodali to take the older, more expensive employees from MVAMC and move them elsewhere.

Exh. 2, Wells Dep. 159. He theorizes that "they want younger people. They want cheaper people."

Exh. 10, Wells Affd. '02, 28. To achieve that, Mr. Paul Smits was, in Plaintiff's mind, ordered to

reduce the number of full-time employees (FTE) at the Martinsburg mental health service line.

Accordingly, Plaintiff surmises that he was too old for the work, too expensive, and they made his

life difficult so that he would quit. Exh. 11, Wells Affd. '00, 20; Exh. 10, Wells '02, 22.

To factually support his theory, Plaintiff cites that ". . . they got rid of the Chief of Psychiatry

who was a senior man and had a big investigation." Exh. 10, Wells Affd. '02, 13 (referring to

Dr. Kodali). He claims that the FTE was reduced because Dr. Kodali was not replaced and further

states that Dr. Nocks was abrupt toward him. He also claims that he overheard Dr. Deutsch order

24

Mr. Smits to "get rid of the low hanging fruit." "You've done well so far, but there's more." Exh. 2, Wells Dep. 161-163.

Despite his assertions, the supervisory structure of the CAT-5 program did not change in 1999. Only the people involved with the supervision changed roles. Exh. 6, Smits Affd. '00, 4. And, again, despite his assertions, there were no reductions in staffing in the substance abuse programs. Dr. Kodali retired in 2000 and was replaced in 2001 by Dr. Amanullah. Dr. Mueller came in March 2002 to replace Dr. Haber, who left in September 2001. During the periods between departures and replacements, fee-based physicians were hired on a temporary basis. Simply put, there were no reductions in the physician staff at the times related to Plaintiff's Complaint. In fact, since Dr. Kodali had been an administrator, the hiring of Drs. Haber, Amanullah, and Mueller actually raised the number of practicing physicians. Exh. 4, Smits Decl. ¶¶ 11 and 12.

Dr. Nocks, Network Director of VISN-5, asserts that he had no plan to move mental health services from MVAMC to other institutions so to reduce or eliminate the number of senior, more expensive doctors at MVAMC to save money. He also declares that he certainly didn't discuss such a plan with Dr. Kodali. Exh. 7, Nocks Decl. ¶¶ 4 and 5. At deposition, Dr. Deutsch, VISN-5 Director of Mental Health Service Lines, testified that there was no effort to encourage older physicians to retire and, further, there was no real cost advantage recognized from removing the older physicians. Dr. Deutsch, at that time, had authority over personnel and budget of all mental health services offered in VISN-5. Exh. 8, Deutsch Dep. 32, 33, 34, 100, 101.

At the local hospital level, Mr. Smits, Manager of the Mental Health Service Line, knew of no plans to move mental health patient services from MVAMC and, as well, states that there was a budget increase for the service line at MVAMC every year from 2000 through 2005. Mr. Smits

25

also declares that there was no plan to reduce that budget by removing senior physicians. Exh. 4, Smits Decl. 15, 16.

Dr. Kodali did retire in mid-year 2000. Prior to his retirement, MVAMC, through a board of investigation, inquired into a problem involving global assessment function scores (GAF). These scores are a method of evaluating the degree of functioning of PTSD patients and are often used for benefits purposes. This inquiry began due to a question raised by the Huntington, WV VA office, which called attention to the possibility of deflated scores being given to veterans at MVAMC. The investigation resulted in a finding that, indeed, some GAF scores were unacceptably deflated and had been assigned without proper clinical assessment. Exh. 17, Moore Decl. This board of inquiry implicated Dr. Kodali and other individuals as persons responsible for the improper scoring.

Since the GAF investigation was done at the direction of the Director of MVAMC, it does not support Plaintiff's theory that the VISN, which had budgetary and personnel authority over mental health services, planned to remove or reduce higher cost employees, for any budget reduction would have been recognized by VISN-5, not by the hospital.

Dr. Deutsch at deposition testified that he could not recall using the term "low hanging fruit" nor did it sound like a phrase he would use. Exh. 8, Deutsch Dep. 98, 99. This statement, if proven, is not probative of age discrimination because it does not rise to the level of implicating age as a decisive or determining factor in any employment decision affecting the Plaintiff. *See, EEOC v. Clay Printing Co.*, 955 F.2d 936, 942 (4th Cir. 1992).

This Defendant is entitled to summary judgment upon the Plaintiff's claims of age and gender discrimination and retaliation because the Plaintiff has failed to show that the legitimate, non-discriminatory explanations articulated by the Defendant are pretextual. Other than a smattering of

unfounded accusations to suggest discriminatory animus which are based upon nothing but Plaintiff's speculation, he has produced no direct evidence to support his claim that age, gender or retaliation influenced any of the Defendant's decisions and conduct of which he complains.

Claims of Title VII and ADEA Retaliation

Count 5 of Plaintiff's Complaint alleges that the Defendant retaliated against him for his participation in the EEO process in violation of Title VII and the ADEA, and further claims that, as a result of that retaliation, he was subjected to disparate treatment and a hostile working environment.

This Court Lack Subject Matter Jurisdiction
Over Plaintiff's Claims of Retaliation Under the ADEA

The ADEA is made applicable to the federal government by 29 U.S.C. § 633a, enacted in 1974, which provides that "[a]ll personnel actions affecting employees . . . who are at least 40 years of age . . . in executive agencies . . . shall be made free from any discrimination based on age."  29 U.S.C. § 633a(a).  Unlike the private sector provision (29 U.S.C. § 623(d)), which expressly makes retaliation a violation of the Act, § 633a contains no prohibition against retaliation.  Section 633a specifies that government personnel actions " 29 U.S.C. § 633a(f).

Because the federal ADEA does not explicitly create a cause of action for retaliation, such claims against the United States are barred by sovereign immunity.  *Cyr v. Perry*, 301 F. Supp.2d 527 (E.D.Va. 2004) (holding "because § 633a of the ADEA contains no express and unequivocal language that waives sovereign immunity with respect to retaliation claims, plaintiff's claims for retaliation under the ADEA are barred by sovereign immunity . . .").  It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for

27

jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 2965 (1983) (citations omitted). The bar of sovereign immunity applies even when purely equitable relief is sought. *See, e.g., Jaffee v. United States*, 592 F.2d 712, 717 n.10 (3d Cir. 1979) (citations omitted). Waivers of sovereign immunity "cannot be implied but must be unequivocally expressed." *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95, 111 S.Ct. 453 (1990) (citations omitted).

The Complaint names as Defendant, Anthony J. Principi, Secretary, Department of Veterans Affairs, in his official capacity. Thus, this is an action against the United States and, therefore, is subject to the defense of sovereign immunity. *See Hawaii v. Gordon*, 373 U.S. 57, 58, 83 S.Ct. 1052, 1052 (1963).

The federal sector ADEA provision does not refer to retaliation at all. Instead, the provision prohibits only discrimination: "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). Subsection 633a(c), which permits claims based on age discrimination to be filed against the government, provides in full, "Any person aggrieved may bring a civil action in any federal district court of competent jurisdiction for such legal or equitable relief as will effectuate the purpose of this chapter." The right to sue the government is thus limited to "aggrieved" parties, those government employees or applicants for employment who – in contravention of § 633a(a) – have been subjected to "discrimination based on age." Because retaliation is not discrimination based on age, government employees such as plaintiff cannot sue their agency employers for retaliation under the ADEA. Nowhere in the provision forbidding age discrimination, § 633a(a), or the waiver of sovereign immunity, § 633a(c), is any indication that Congress waived sovereign immunity for a retaliation claim.

28

A waiver of sovereign immunity must be definitively and unequivocally and cannot be enlarged beyond the boundaries that the statutory language plainly requires. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34-36, 112 S.Ct. 1011, 1015 (1992). Here, the relevant statutory provision, § 633(a), bars "discrimination based on age," but retaliation is not "discrimination based on age." Thus, while Congress explicitly waived sovereign immunity for age discrimination claims, it did not do so for a claim based on retaliation. *See Cyr v. Perry*, 301 F.Supp. 2d at 533.

Rather, retaliation is a basis distinct from age discrimination; it entails reprisal for individual's participation in a civil rights proceeding. *See* § 623(d) (private sector retaliation provision bars "discriminat[ion] . . . because [an] individual . . . has made a charge . . . under [the ADEA]) (emphasis added); *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312-13 (7th Cir. 1989) (Posner, J., concurring). Judge Posner explained that:

> [R]etaliation and discrimination are separate wrongs. A white person who opposes discrimination against blacks and is fired in retaliation for doing so is not being discriminated against because of his race, just as a railroad worker who is fired for filing a complaint under the Federal Employee Liability Act cannot claim that the retaliation is itself a violation of that Act. Title VII does not treat retaliation as a form of discrimination; it contains a separate provision forbidding retaliation.

Under a common-sense reading, retaliation is not "discrimination based on age."

The private sector ADEA includes both a subsection that precludes discrimination and a separate subsection that precludes retaliation. The private employer discrimination provision mirrors the federal discrimination provision: it bars "discrimin[ation] . . . because of such individual's age" while the federal provision bars "discrimination based on age." 29 U.S.C. §§ 623(a)(1), 633a(a). It is unlikely that Congress intended the federal sector prohibition on age discrimination to

29

encompass both discrimination and retaliation while crafting the similarly worded private sector prohibition to cover discrimination only.

This conclusion is bolstered by the federal sector ADEA exclusivity provision, § 633a(f), which provides that government personnel actions "shall not be subject to" any other provision of the ADEA – including, presumably, the private sector provision that covers retaliation. *See Lehman v. Nakshian*, 453 U.S. 156, 168, 101 S.Ct. 2698, 2705 (1981)("federal personnel actions covered by [the exclusivity provision] are not subject to any other section of the ADEA"); *Edwards v. Shalala*, 64 F.3d 601, 606 (11th Cir. 1995) ("[b]ased on the express language of the statute, it appears that any referral to other provisions in the ADEA is forbidden"). Thus, while Congress provided for retaliation and discrimination claims by private employees, it only provided for discrimination claims by federal employees.

The courts have long recognized the difference between the federal sector and private sector provisions. *See Johnson v. Mayor and City Council of Baltimore*, 472 U.S. 353, 356 n1, 105 S.Ct. 2717, 2718 (1985) (explaining that "[f]ederal employees are covered in a separate section of the Act and are treated differently from nonfederal employees in various ways not relevant to this case"). Other judges have reasoned that the ADEA does not waive sovereign immunity for claims of retaliation. *See Yap v. Slater*, 165 F. Supp. 2d 1118 (D. Hawaii 2001) (not deciding the issue, but reasoning that sovereign immunity bars retaliation claim); *Tomasello v. Rubin*, 920 F. Supp. 4, 6 (D.D.C. 1996); *Koslow v. Hundt*, 919 F. Supp. 18, 20 (D.D.C. 1995); *Muth v. Marsh*, 525 F. Supp.

604, 606 n.1 (D.D.C. 1981) ("[t]he Court notes, without deciding the issue, that [§ 633a] . . . does not appear to create a cause of action for retaliation").[1]

A contrary conclusion has been reached in the D.C. Circuit, without benefit of briefing, in *Forman v. Small*, 271 F.3d 285, 298 (D.C.Cir. 2001). This Court should decline to follow this holding for several reasons. First, the language barring "[a]ny discrimination based on age" should be given its common sense meaning, not the "sweeping" meaning adopted by the D.C. Circuit, because sovereign immunity is at stake. Second, the *Forman* court's theory that the federal sector provision was designed to "reach more broadly " than the private sector provision does not withstand scrutiny. Rather, both provisions have differing requirements, some of which are broader in the federal sector, as the court noted (*see Forman*, 271 F.3d at 297 (citing different age limits)), but the more important of which are decidedly narrower. *See Lehman*, 453 U.S. at 162 (no jury trial authorized by federal sector provision). Finally, the D.C. Circuit court did not address the availability of a remedy for retaliation that existed at the time the ADEA was enacted and that exists to this day under the Civil Service Reform Act, 5 U.S.C.A. § 2302(b), §§ 7512, 7701-03 (CSRA).

Plaintiff cases of action for retaliation under the ADEA (both disparate treatment and hostile work environment) should be dismissed for lack of subject matter jurisdiction.

### The Plaintiff Does Not Establish a *Prima Facie* Case of Retaliation

It is uncontested that Plaintiff did, in fact, participate in the protected EEO process. There is no dispute that in November 1999, he filed an EEO complaint alleging discrimination on the basis of age and sex, which commenced in October of 1999. This complaint was dismissed on June 27,

---

[1]The decisions of the district court for the District of Columbia have been overruled or superseded by *Forman v. Small*, 271 F.3d 285 (D.C. Cir. 2001).

2001, and a Final Agency Decision was issued on August 6, 2001.  This was appealed by the

Plaintiff, and on February 26, 2003, the Final Agency Decision was affirmed.  Plaintiff filed a second

EEO complaint on February 22, 2002, alleging that since June 2001, he was discriminated and

retaliated against for his prior EEO activity and by reason of his age and sex.

Plaintiff Suffered No Adverse Employment Action
and, Therefore, Cannot Establish a *Prima Facie* Case

Plaintiff cannot establish a *prima facie* case of retaliation because he suffered no adverse

employment actions as has been shown in the foregoing portions of this Memorandum.  Herein

above Defendant has presented a profusion of facts and discussion which would be redundant to

repeat at this point.  It is respectfully urged that those foregoing portions be treated as if repeated

verbatim.

Plaintiff Fails to Prove Any Causal Connection
Between the Protected Activity and an Adverse Employment Action

Assuming, *arguendo*, that Plaintiff has proven he suffered an adverse employment action,

which he has not, he fails to establish that action was taken because of his protected activity.  As

stated above, Plaintiff first filed an EEO charge in November 1999.  That charge was dismissed on

June 27, 2001.  A Final Agency Action (FAD) was issued on August 16, 2001.  Plaintiff appealed

and it was finally decided on February 26, 2003, by the EEOC affirming the FAD.  Plaintiff filed a

second charge on February 22, 2002, alleging, among other things, that since June 2001, the

Defendant discriminated/retaliated against him for his prior EEO activity.

Plaintiff's states that the investigation involving his November 1999 complaint began in

October 2000 and that ". . . they began to lay off me . . ." and ". . . for about six months prior to that

things had, they had been easing up on me . . ." Exh. 10, Wells Affd. '02, 13 and Exh. 2, Wells Dep.

32

173. He maintains that the harassment increased in June of 2000 when the first ". . . complaint was dismissed somehow they found out about and all, well, a lot of unpleasant things began to happen." and ". . . it all started  . . . the whole process got cranked up again after my EEO case was dismissed." He further testifies that "Somehow they found out about that. . . .they started tightening the screws again,". Exh. 2, Wells Dep. 188, 210. As support for his reprisal claims, Plaintiff alleges that the timing of the treatment supports him. Exh. 10, Wells Affd. '02, 32 and Exh. 2, Wells Dep. 209. The other facts he relies upon to support his claims are: "A general and obvious environment of hostility."; references to unidentified e-mail messages wherein he complained.  He could remember at deposition no remarks from managers causing him to believe that decisions were made or conduct occurred in reprisal for his EEO activity.  Exh. 2, Wells Dep. 210-213.  For a plaintiff to establish the mandatory causal connection between adverse employment actions and the employee's prior EEO activity, it is imperative that the decision making officials had knowledge that the plaintiff, in fact, had previously engaged in a protected activity.  This is essential to proving the third element of the *prima facie* case.  *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998).

Discrete actions identified by Plaintiff as being acts of retaliation were a letter from Dr. Hill dated December 13, 2001, advising Plaintiff that effective December 17, 2001, he was assigned to doing primary care of DOM patients, transferring Dr. Wells' detox work by reason of the Plaintiff's lack of formal training in psychiatry; and, as well, he cites his performance evaluation completed by Dr. Hill in 2002, which Plaintiff believed was negative. Dr. Hill, however, had no knowledge of Dr. Wells' prior EEO activity until about one year before Dr. Hill was deposed in this case on

33

January 28, 2005.  Exh. 18, Hill Dep. 73– 80  Obviously, none of Dr. Hills' actions, decisions, or inactions were caused or motivated by retaliation.

Plaintiff's retaliation claims are largely founded upon assertions that Defendant's actions must have been retaliatory because they followed his supervisors gaining knowledge that his November 1999 complaint had been dismissed in June of 2001.  This temporal proximity is insufficient to show that a causal link exists.  In *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989), the plaintiff endeavored to make a causal connection between protected activity and termination on the grounds that her supervisors knew of the protected activity at the time they fired her.  That claim was rejected by the court, holding that "mere knowledge on the part of an employer that an employee it is about to fire has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for discharging the employee."  The passage of time (9-10 months) has a tendency to negate the inference of discrimination.  *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004).  Even a 10-week interval is long enough to weaken the inference of causation.  *King v. Rumsfeld*, 328 F.3d 145, 151 n. 5 (4th Cir. 2003).

In the matter at hand, it seems probable that Dr. Wells' supervisors found out about his November 1999 filing at least close to the dates of the taking of their testimony, that basically being October – November 2000.  See Exhs. 5, 6, 12, 13.  Plaintiff admits that beginning in October 2000, "they began to lay off me" and ". . . for about six months . . . they had been easing up on me."  Exh. 10, Wells Affd. '02, 13 and Exh. 2, Wells Dep. 173.  His contention, as shown above, is the harassment began anew in late June 2000 when ". . . the complaint was dismissed somehow they found out. . ."  Exh. 2, Wells Dep. 188, 210.  There is nothing in the record, and Plaintiff has offered no proof, that his supervisors discovered in June of 2001 that his 1999 EEO complaint had been

34

dismissed, only his self-serving, unsupported statement is offered as proof, and absent more, that statement is not sufficient to establish a primary *prima facie* case of discrimination. *Goldberg v. B. Green and Co.*, 836 F.2d 845, 848 (4th Cir.1988).

In sum, Plaintiff relies upon his filing an EEO complaint in November 1999 to give reason to what he claims was retaliatory treatment by Defendant commencing in June of 2001, about a 19-month gap. Shortened, perhaps, by some of his supervisors probably not knowing he engaged in EEO activity process until October 2000. Still leaving a gap of at least 8 months. Accordingly, there is no temporal proximity and, therefore, no causal connection between his filing of an EEO complaint and the beginning of what he claims was retaliatory treatment.

Further, his position seems nonsensical. It is not understandable why his managers would wait such a long period when it seems other opportunities would have arisen in which to take retaliatory action. It is also not reasonable to think that they would act in retaliation after delaying such a long period, particularly when the FAD had not yet been issued (August 16, 2001) or, if one believes they had, in fact, exercised such caution, it seems unlikely that they would retaliate during the period of time the case was on appeal.

<u>Defendant Had Legitimate, Non-Retaliatory/Discriminatory Reasons for Its Conduct</u>

If it were assumed for argument's sake that Plaintiff established a *prima facie* case of retaliation, the Defendant must articulate legitimate, non-retaliatory reasons for its conduct. *Price v. Thompson*, 380 F.3d at 212. In foregoing portions of this Memorandum, which portions are entitled "Statement of Facts"; "Plaintiff Cannot Establish a *Prima Facie* Case of Age Discrimination or Retaliation Since He Did Not Experience an Adverse Employment Action"; "Plaintiff Cannot Establish a *Prima Facie* Case of Gender Discrimination Since He Did Not Experience an Adverse

Employment Action"; "Defendant Had Legitimate, Non-Discriminatory Reasons for Its Conduct";

and "Plaintiff Failed to Prove that Defendant's Reasons for Its Conduct Were Pretextual." In those

foregoing sections, Defendant has produced more than sufficient facts to establish its non-retaliatory

reasons for its conduct and decisions and, therefore, to repeat them at this point would be a mere

redundancy. It is respectfully requested that those sections be read as a part hereof.

Plaintiff Has Failed to Prove That Defendant's Reasons<br>For Its Conduct Were Pretextual

Defendant has carried its burden of production by articulating the non-retaliatory basis for

the conduct and actions that form the basis for Plaintiff's claims. As has been shown above, the

presumption raised by the *prima facie* case then drops from the case. Plaintiff must now carry his

ultimate burden of proving that Defendant's proffered reasons are not the true reasons for the

Defendant's decisions and conduct. Simply put, there is no evidence even suggesting, let alone

establishing, that Defendant's reasons for its actions, conduct, and decisions of and toward the

Plaintiff were pretextual and that retaliation and discrimination were the real reasons they were

taken. Indeed, Plaintiff's retaliation claims are largely founded upon the *ipse dixit* assertion that

Defendant's actions must have been retaliatory because they occurred after he filed his first EEOC

charge and after his supervisors found out that charge had been dismissed. Here, as well, Defendant

has shown that there is abundant evidence confirming the non-retaliatory reasons for Defendant's

actions and conduct, and that those actions and conduct were not in reaction to Plaintiff's charges

of discrimination. In fact, the evidence is so one-sided as to all the discrimination and retaliation

claims that judgment should be entered in Defendant's favor. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. at 251-252, 106 S.Ct. at 2512.

36

Plaintiff's Claims of Hostile Work Environment

Counts 2 and 4 of Plaintiff's Complaint allege the Plaintiff was subjected to intentional discrimination by the Defendant on account of his age and sex by subjecting him to harassment and a hostile work environment.  Count 4 of the Complaint alleges that the Defendant intentionally "discriminated/retaliated" against Plaintiff because of his participation in the EEO process by subjecting him to harassment and a hostile work environment.  In support for those claims, Plaintiff relies upon the same factual allegations he used to support his claims of disparate treatment and retaliation as asserted in Counts 1, 3, and in part, Count 5 of his Complaint.  These factual allegations appear in paragraphs numbered 7 through 41 of the Complaint.

Plaintiff Cannot Establish *Prime Facie* Claims of Hostile Work Environment

It is not settled that a cause of action based upon hostile work environment under the ADEA exists.  *See, Burns v. AAF-McQuay, Inc.*, 166 F.3d 292, 294 (4th Cir. 1998); *Causey v. Balog*, 162 F.3d 795, 801 n. 2 (4th Cir. 1998) .  Further, it appears that the Fourth Circuit has not established the "contours of such a claim" [retaliatory harassment].  *Settle v. Baltimore County*, 34 F.Supp. 2d, 969, 994 (D.Md. 1999).  Accepting the existence of the first as a valid cause of action and presuming the second includes the typical factors necessary for a retaliation claim for the sake of this argument, Defendant asserts that to state a hostile work environment claim, this Plaintiff must prove (1) that he experienced unwelcome harassment; (2) that the harassment was based on race/age/retaliation; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere.  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001).  If Plaintiff can raise an issue of fact with respect to each of these elements, he must then show that there is some basis for imputing liability to the Defendant employer.  *Id.* at 184.  To be actionable under Title VII

37

(and presumably the ADEA), the conduct in question must be both subjectively harassing to the plaintiff and objectively harassing from the standpoint of a "reasonable person." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22, 114 S.Ct. 367 (1993). Not every offensive action gives rise to a hostile work environment claim, and sporadic incidents of offending conduct will not suffice.

Plaintiff cannot meet the second element of a hostile work environment *prima facie* case and show that he suffered "unwelcome" harassment based upon his age, gender, and/or retaliation. Defendant has heretofore, in fact, demonstrated that its actions, conduct, and decisions of which Plaintiff complains were not motivated by gender or age discrimination, nor did they occur for reasons of retaliation. Rather, as herein above discussed, the Defendant has met its burden and has clearly articulated non-discriminatory reasons for its action, decisions, and conduct. Having been fully developed above, those need not be repeated at this point. The simple truth is that the Plaintiff cannot claim to have been abused by something to which he was not subjected. The managerial quality of Defendant's conduct and decisions in not the issue at hand for "[t]he fact that the employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proffered explanation is pretextual." *Essex v. UPS, Inc.*, 111 F.3d 1304, 1310 (7th Cir. 1997).

Nor can Plaintiff satisfy the third element of a *prima facie* hostile work environment case. To do so, he must establish that the Defendant's actions were so sufficiently severe or pervasive to actually alter the conditions of his employment and create an abusive atmosphere. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399 (1986). To determine the severity, hostility, and pervasiveness the totality of the circumstances must be viewed, and among those circumstances are (1) frequency of the discriminatory conduct; (2) severity of the conduct; (3) whether it is

38

physically threatening or humiliating as opposed to simply an offensive utterance; and (4) whether it unreasonably interferes with the Plaintiff's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371 (1993). The reasonable person standard is designed to filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes and occasional teasing. *Ocheltree v. Scollen Productions, Inc.*, 335 F.3d 325, 333 (4th Cir. 2003), quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275 (1998).

Plaintiff bases his hostile working environment claims upon conduct that does not rise to the level of such a violation. A hostile work environment is present " ' [w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." ' *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998), quoting *Harris*, 510 U.S. 17, 21.

The Fourth Circuit hasn't hesitated to find the existence of a hostile working environment when an employee has been confronted daily with repugnant insults. The plaintiff in *Spriggs*, for example, twice left his job because of the actions of his white supervisor. *Spriggs v. Diamond Auto Glass, supra*. He had been subjected to "incessant racial slurs, insults and epithets." *Id.* at 182. After returning to his job, the conduct continued and he was "habitually" called "monkey," "dumb monkey" *Id.*, 185. Also, the Fourth Circuit had no trouble reversing a grant of summary judgment when one of the plaintiffs testified his supervisor called him and other black employees names such as "boy," "jigaboo," "nigger,". *White v. BFI Waste Services, LLC.*, 375 F.3d 288, 297 (4th Cir. 2004).

39

Unlike these traditional cases of harassment where the conduct alleged was plainly wrong, the conduct, actions, and decisions of the Defendant of which Plaintiff complains emanate essentially from Plaintiff's feeling that he couldn't keep up with his workload while adequately caring for his patients, and with his dissatisfaction of the realignment of his duties due to management determining that they demanded appropriate training in psychiatry that he did not possess. These issues/allegations, along with his extensive list of the specific incidents he felt were insulting or harassing, were often managerial determinations made to adapt to an ever-changing mental health environment. Frequently, they were actions reactive to Plaintiff's behavior and sometimes they were merely conditions created by the physical plant and available equipment. None were inherently discriminatory nor retaliatory.

In comparison to the measure of actionable conduct established by the Fourth Circuit, a few cases which are discussed above, Plaintiff's allegations of gender/age/retaliatory harassment fall short of cognizable claim. The complained of conduct did not happen in a compressed period of time but, rather, the time period during which the incidents of conduct and/or decisions occurred over two and one-half years. When considered to have happened, if at all, over such a lengthy period, these incidents are indeed far and few between. Basically, his complaints of hostile work environment were based upon normal workplace discord and seemingly, to some degree, upon personality conflicts. For example, as to Michelle Cooke, he states, "the tenor of our relationship was very good . . . I continued to try and make this relationship work and when we disagreed, things deteriorated rather rapidly and she began to take the same tact that's been true ever since, I've got to show you who's boss." Exh. 2, Wells Dep. 167. Thus, it is submitted that Dr. Wells is unable to establish that

he was subjected to an objectively hostile or abusive work environment that unreasonably interfered with his work performance.

Finally, since the Plaintiff is unable to establish the requisite elements of a hostile work environment, it is not necessary to address the issue of imputing conduct to a defendant. The Defendant submits, however, that it is nonetheless important to recognize that the VAMC took significant steps to accommodate and remedy some of the conduct of which Plaintiff complained. It is clear as regards his scheduling and alleged burdensome workload, that on several occasions his managers attempted to alleviate the problems and did, in fact, meet with him and plan his schedule so as to permit him time to do his "paperwork" and reduce the number of trips he need make between the CAT-5 DOM clinic and the detox unit. It is also plain that prior to realigning his duties, his supervisors gave him time to present additional evidence of psychiatric and/or addiction training. Finally, it is painfully obvious that he was consulted prior to his office being moved. These consultations involved not only letting him have a voice out to decorate the new offices, but also in assisting him move his personal effects and arranging for his continued use, at least on a part-time basis, of an additional office.

## CONCLUSION

For the reasons set forth above, the Defendant respectfully submits that the Plaintiff has failed as a matter of law to establish a *prima facie* case with respect to his claims against the Defendant, and that this Court lacks subject matter jurisdiction over Plaintiff's claims of retaliation

41

under the ADEA and that, accordingly, those claims should be dismissed and summary judgment

should be granted to the Defendant.

Respectfully submitted,

THOMAS E. JOHNSTON
United States Attorney

by:

Daniel W. Dickinson, Jr.
Assistant United States Attorney
P. O. Box 591
Wheeling, WV 26003
(304) 234-0100

42